The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons who have any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are advised to draw a knight and give their attention. For the Court is now sitting. God save the United States and its Honorable Court. Thank you. Good morning. You can be seated. We're ready to hear argument in our first case this morning, United States v. Charles Anthony Walker. Mr. Maher, whenever you're ready. Good morning. It may please the Court. Thomas Maher on behalf of the appellant Charles Walker. Mr. Walker is currently serving a sentence in excess of 400 months for his alleged role in the robbery of two different Kay Jewelers, one in Elizabeth City, one in Garner. There is no doubt that Mr. Brown and Mr. Maynard were involved in these robberies. They were on video, entering the stores, brandishing guns. The question before the jury was whether Mr. Walker played a role in organizing or executing those robberies. The issues, the three first issues I briefed are all related in the sense that they are placing the thumb on the government side of the scales and argue unfairly. The first issue had to do with the impact on three of the employees of these stores who went through the robberies. The second two are related and they are opinion evidence. The second one was store employees offering their opinion on Mr. Walker's role when he was inside the store in Elizabeth City. Based on their personal observations of what was their testimony just telling the story, so how is that inappropriate? It was based on their interactions. It is inappropriate because the opinions they offered, for example, one of them testified that Mr. Walker was the decoy man. That wasn't simply an observation. That it appeared to them that he was acting as a decoy, not that he was. In their opinion, he was. She testified that she thought he was the decoy man. That, of the store. I thought that was testimony that the defendant's counsel elicited. That answer came in response to a question from defense counsel, but he had actually asked about the leadership role between Mr. Brown and Mr. Maynard. In answering that, she volunteered that Mr. Walker appeared to be the decoy man. He had not specifically asked about Mr. Walker's role. He asked about the relationship, right? That seems to be the relationship. I'm watching a football game and I see two guys running around. What's the relationship between those two guys? The guy running the deep route was the decoy. They were throwing the out route. That seems right to me. That's asking the relationship. She gave you the answer that you wanted. Or maybe didn't want, but you asked for it. I wasn't trial counsel, but in reading the question, the question, I believe, was directed towards the two people, Mr. Brown and Mr. Maynard, who clearly were robbing the store. They were the two that had initially gone in left and then came back with the guns. He was trying to ascertain which of those two was the leader. In responding to that, she volunteered that the defendant, Mr. Walker, appeared to be the decoy man. So I don't believe that it was invited by the question. I believe it was in response to a question that went to the role of the two other people who were in the store actually robbing the store. The testimony that he was acting afraid came during the direct of the other employee. Both of those went to the issue, was he there in some innocent role, like he later testified, or was he in there playing a role as described by his co-defendants and as urged by the government? I do not believe that that is the type of lay opinion that somebody just watching somebody in the store should be entitled to give. It went to a very crucial issue in the case, which is, what was Mr. Walker's role? He testified. He testified about being in the store. He denied that he was involved with his two co-defendants. Well, given the wealth of other evidence against Mr. Walker that indicates what his role was in the robberies, how is this not harmless? This is not harmless. There is clearly a fair amount of evidence introduced by the government. The principal evidence came from his co-defendants who described in detail what they claimed his role was in recruiting them and arming them and planning this. There was also cellular data and GPS tracking data and things that corroborated what they said, like the phone charger being tied to the tree where they left the stuff. There was all kinds of other evidence against Mr. Walker. There certainly was a great deal of evidence tying him to his co-defendants. The GPS data, the cell phone data showed that he was traveling. And the vehicles that were used were Mr. Walker's. Well, the Mercedes was clearly his. There is a video that shows a Mercedes being followed by a van. He denied and testified that he had nothing to do with the minivan. Mr. Sparks claimed that he had sold that to Mr. Walker. Mr. Walker testified that that simply wasn't true. He testified in detail about his connection with these people, that he knew them, that he recognized that they were in the same places, but testified that he was not involved in the robbery. And that was up for the jury to assess whether he was involved in the robbery or all of these things were colossal coincidences. Well, I mean, that's what the government's argument would be, his position, of course. And he testified. And ultimately, the jury isn't choosing between his testimony and the government's, but whether they are convinced beyond a reasonable doubt by the government's The most damaging evidence, if you believe it, was from his co-defendants. But they obviously had plea deals. They had extensive criminal histories. They stood to benefit. Both of them were on tape in both robberies with guns, so they had no defense. You raised a number of issues. Which do you think is your strongest point? If I had to pick the strongest, I would say the third issue, which is Agent Robertson's testimony concerning the jail calls. I agree with that. I would certainly address that. What happened here is Mr. Walker was talking to a woman whose last name I believe was Baldwin. She was serving time in the North Carolina prison system. She had nothing to do with these robberies, as far as I can tell. So they were these conversations that were recorded, and the government obtained them. And the FBI agent in charge of the investigation subsequently listened to these and was allowed to testify to what their meaning was in connection with both. Was he testifying as an expert witness or a lay witness? As a lay witness. He was not tendered as an expert. And that makes a crucial difference in terms of how the court should rule on the admissibility of his opinion. And it was... If he had been certified and testified as an expert, could he have given these? I mean, isn't that the sort of conversations that we've allowed with an appropriate background, maybe he had it, maybe he didn't, all that. I get that. But if he was qualified as an expert, he could have done this type of testimony. But your angst is that they didn't qualify him, and I agree, they didn't qualify him. Right. Well, it certainly made a difference. Had he been qualified as an expert, I think some of the conversations he may well have been able to give expert testimony. But some of them I think would be beyond being an expert. For example, I don't know if there was any being about a robbery. There was no specific... Right, but that's... Hold on. Oh, go ahead. That seems to meet the rub here, right? Because that's what I was trying to get at a little bit. Because when you look at the conversations, part of them do seem subject to sort of expert testimony. But parts of them are... Do look like lay opinion testimony, right? Because they really are interpreting the words in light of some sort of common sense and background knowledge. And that does strike me as sort of appropriate lay opinion testimony. But hypothesize that I agree with you, that some of it looks like agent expert testimony. How is the... How are they supposed to do both, I guess, is the rub. Well, I guess in theory he could have been qualified as an expert and given both expert and lay opinion testimony. So long as he made clear which he was doing it right. Right. In other words, some of it would have been justified as an expert and some might have been justified without being an expert. Here he was never tendered as an expert. He did, I will say, in talking about this basketball game conversation, rely on his experience and expertise in interpreting that. So he appeared to at that point kind of shift over... Wasn't there also lay testimony from Mr. Maynard about the basketball game conversation? Yes. He was apparently in the car at the time of the conversation and he testified that this was in fact a conversation about a robbery. He had, of course, incentives to police the government and reasons for the jury not to believe. And Mr. Walker testified that no, this was not about a robbery. I'll say on the... The basketball game seems to be the conversation that's the most veiled, right? It really could be about a basketball game unless someone told the jury otherwise. I think there was a July conversation, a couple of those, where I was honestly kind of confused about why anyone needed to interpret those. It seemed like just, you know, giving the definitions of English words that didn't seem particularly veiled, but I may have missed something. Well, no, Your Honor, I don't think you missed something. I think there were two conversations in July. Both, I think, took place on the same day. And the agent testified to a number of things, some of which were just English words but some of which weren't. So, for example, I believe he testified about a comment that he'd go straight to the back room and he said that was about going to a back room. Straight to a back room. Well, I don't know there was any interpretation in that other than he is now endorsing that it's part of a robbery when Mr. Walker said, no, it was about gambling. He did, I believe, talk about his lineup, meaning that he was a leadership role in the robbery. And at Joint Appendix 594, he, over objection, testified that the word tools meant firearms. And I think that goes beyond just normal English. So there are times when he was simply saying it means what it means, like back room, and there's times when he was giving an opinion that the conversation about tools means Mr. Walker is providing firearms. And Mr. Walker also chose to testify, and didn't he explain what, from his perspective, what all of those things meant? Yes. He addressed, I don't know that he line by line went through each of them, but he talked about Charles Xavier, he talked about the back room, he talked about the basketball game. And, of course, the jury had reasons to not believe what he said. And when an agent is kind of taking the other side and saying, no, a basketball game is about a robbery, and then you have Mr. Walker saying, no, it's about these Rutgers games, which are, in fact, a real thing, and we bet on basketball, that allowing the agent to give that testimony unfairly tipped the scales. And I will say that not all of these were objected to at trial. The basketball game, for example, there was no objection. But a number of the interpretations of the July 12th conversation, there were contemporaneous objections. And so, at least as to those, if not to all of them Was there ever an objection that this was impermissible lay testimony, that it should have been expert testimony? I thought the objection was that the officer didn't have the requisite knowledge because he was from a different part of the state. That was the primary argument made, that the defendant was from Greensboro, the agent had served in the eastern part of North Carolina, and the argument was to the extent this was relying on understanding slang, he didn't have the geographical knowledge. The specific argument that I made in my brief was not at least clearly articulated before the trial court. But as the agent testified, there were at least general objections to a number of the questions for the July 12th conversations, including interpreting tools as meaning firearms. So I understand that at least some of this may be under plein air. I would argue that not all of it should be viewed as plein air. There were, in fact, objections. And the reason this is important goes to the fact that Mr. Walker testified and Mr. Maynard testified, and the jury was going to have to decide, based both on the content of the conversations but on the testimony given, what these meant. If they believed that was a conversation about a robbery, there really wasn't much else they needed to decide on the case. If he's describing a robbery, he's guilty. And, of course, having an agent get on the stand and say, in essence, Mr. Maynard telling the truth, it is a robbery, and Mr. Walker, when he later testified … And that goes back to my question earlier about all of the evidence against Mr. Walker. You might have a better argument if the evidence was really a Agent Robertson says versus Mr. Walker says, but it was Mr. Walker says versus Agent Robertson and the witnesses and the vehicles and the cellular data and the GPS tracking and all the other co-defendants who testified and the screenshots of the alleged threats. So I'm not sure you can get past harmless … And I understand that. I will say, when you've got co-defendants who are specifically saying, Mr. Walker recruited us, he provided the guns, he provided the plans, the rest of that evidence certainly corroborates a lot of the logistical aspects of what they've said. Other than these phone calls, it doesn't directly corroborate that Mr. Walker was the leader, played a role in organizing these robberies. It placed him with them, and he testified that, in fact, they'd followed him, that he was present when they came into the store. A jury might not believe that, but they might give them reasonable doubt, and that would be a reason to vote not guilty. So these conversations, in particular, were important because they were the direct evidence from Mr. Walker's own mouth that the government says, in essence, were admissions to being involved, not just being involved in a robbery, but to actually being a leader and providing the firearms, which were the tools. So I understand that there's a significant amount of evidence, but the quality of that evidence was primarily from the co-defendants and not the rest on that. If there are no further questions, I will respond further. All right. Thank you. You have time in rebuttal. We'll hear from the government. Ms. Fritz. Good morning. May it please the Court, Christine Fritz, on behalf of the United States, asking you to affirm the judgment of the District Court. To begin with, I want to focus on the overwhelming evidence against the defendant, and Your Honors have focused on some of that. We have, obviously, a very compelling testimony from the co-defendants. We have the historical cell site data that tracks these individuals traveling together, especially one coupled with the Chamber's GPS tracking. You have the very unusual route to Virginia, Elizabeth City, Edenton, tracking back after they ran out of gas on their way out. We also have telephone records and connections, and I think that that's something that's important. There was evidence that the defendant was speaking with, or his telephone was connected with Maynard's telephone during the actual Elizabeth City robbery. Similarly, Agent Sutton testified about how there were phone calls between the defendant and Chris Brown's telephone right around the same time of the Garner robbery. You have the traffic camera footage. Yes, and given all of this evidence, then, what was the relevance for the government to elicit from the victims how this impacted them days and weeks and years later? How the victims were feeling in the aftermath of the robbery, it is relevant to whether a reasonable person in their shoes during the robbery would have felt the intimidation and fear. And they had already testified as to how they felt during the robbery, that they thought they might die, that they were afraid. So that argument doesn't hold water as to the reason for them testifying as to how they felt after the fact, other than to unduly prejudice Mr. Walker. I think in the, I would suggest that the immediate aftermath of the robbery, I think that is all relevant. I do think that the further in time you get from testifying just as to the immediate aftermath of the robbery. Well, I think that if you look at the questions asked, for example, of Ms. Benet and Ms. Swain, it was, how did this affect you? And I absolutely acknowledge it would have been preferable for there to be a temporal limitation or some kind of focus in how that question had been asked. But again, it is relevant as to, because it can be probative of what their experience was during the actual robbery. Right, which they had already testified to. And for example, I do... Help me understand why afterwards. I take you to sort of be saying, yeah, you shouldn't talk about not being able to sleep six months later. But tell me why, which I think you're obviously right to sort of concede on, but why would it be relevant if the question had been asked more precisely and said, all right, that night, how did you feel that night after it was over? Help me understand why that would be relevant. It might still be a 403 problem, but what's the relevance of that? Well, one of the elements of the robbery is that it was accomplished by force, violence, or intimidation. Intimidation, yes. So the, and of course that is an objective standard, but how the individual who experienced the robbery is subjectively feeling, both during and I think in the immediate aftermath of the robbery, is probative of, for example, the degree of fear, the degree of intimidation. And I acknowledge that the further... Weren't guns used in these robberies? Yes. What more needs to be said about force, fear, or intimidation? Well, and in the Hendricks case from, I believe, the Second Circuit, that was also a case where guns were used. Right, and that's not a good case for the government. There are... I know you cite that, but that actually weighs more in favor of appellants, because in Hendricks, the Second Circuit said that testimony concerning the impact of the robbery weeks and months after the crime has undisputedly ended was only minimally probative of the element. And I think it does go to show the relevance. I mean, they're saying it's probative, perhaps minimally the further you get out of time, and I think then you run into the 403 balancing. But, for example, if you look at Ms. Bene's testimony... Do I take you to be arguing before us that, yes, relevant under 401, but the can't sleep six months later, you're sort of conceding that's like a potential 403 problem, but it's not a plain error problem that requires reversing? Yes, and I do also think that that highlights the importance that if there had been an objection, I think that that would have affected the information that was being elicited. And, for example, with Ms. Bene, one thing that struck me... If you watch the video, there's a portion where she is being... Brown is attempting to comfort her, and he's touching her. And so she said that that... She testified that that was very upsetting to her. It made her feel disgusting. And her testimony about, for example... That's not intimidation, is it? I mean, I get why it's disgusting, and I get why it upsets her, and I get why at sentencing that would be powerful evidence to give to the judge to drop the hammer, right? All of those things I totally get. What I don't get is what that's got to do with intimidation. I think that when you have one of the robbers who are testifying that they were trying to comfort the victim, trying to perhaps make it less scary, I think that that might be probative of the intimidation. And, again, I'd like to... Isn't that the opposite, right? I mean, at least if she's saying, he was trying to comfort me, and that made me feel, like, disgusting. Not scared, but disgusted. I mean, you know, it's a little bit of a difference, right? I mean, it's got a slightly different undertone. A little bit, but I think, again, it underscores the impact of the whole experience on her. And I also think that, ultimately, when you look at, for example, Benet and Swain, the government, after this testimony was elicited, the government then, again, focuses on, were you able to go back to work? Why not? I was afraid. So, and I think that, also, this was not objected to, so it's under a plein air standard, and the evidence is overwhelming. Yeah, that's your best argument. I would agree with that. Can you talk a little bit about the expert issue, too? So, I mean, we sort of have a number of cases over a fairly long period of time now where we keep saying, hey, government, when you've got an agent who's testifying about the meaning of language, there are lots of things that you need to pay attention to, and qualifying them as an expert in an appropriate manner, ensuring that their dual roles as a fact witness and an opinion witness are separate, understanding that you can have lay opinion and expert opinion, but you've got to be clear that you're separating them. And this strikes me as sort of the poster child for doing none of those things. I think that when, in reviewing a lot of those cases, for example, the Johnson case, the agent whose testimony was problematic in the Johnson case, he was called simply to testify only to the meaning of recorded telephone conversations. He wasn't involved in the surveillance or the investigation. Here we have the individual who was investigating from the inception, and I think that when you look at the small part of his testimony— Did he listen to all of the telephone conversations? He testified that he listened to many telephone conversations. He didn't give a specific number, but he said that he listened to telephone conversations that the defendant was a part of. He listened to the phone conversations from associates of the defendant, not necessarily that the defendant was on the line. Did he listen to them in real time or after the fact? These were after the fact. These were recorded telephone conversations. And I think that it would have been helpful, and it would have perhaps enabled the government to give an expert notice. But again, this wasn't objected to on the basis that this is an expert testimony. And if you look at the testimony that this agent gave— I don't see how it could be expert testimony. Anyway, even with training, this isn't the sort of expert testimony we see in drug cases where there's particular lingo connected to particular drugs or drug transactions. These words, I don't see how any sort of training could have made you an expert. Well, and I think that that's why it was always being discussed in the context of lay opinion testimony, that this was sort of—when the speaking about the slang words first came up, it was during the charge conference where the government forecasted that it expected to introduce lay opinion testimony. The court indicated that it was not going to allow certain testimony about the handwriting, but it was going to allow the testimony about what certain slang words meant. But we have said that slang, not just slang with respect to drugs, but slang in general can be the subject of an agent's expert testimony under at least some circumstances. Whether you could have met those requirements here is a different question, but we have said that slang is something that is subject to expert testimony. Yes, and it can be subject to expert testimony. And I think that we perhaps could have offered this individual as an expert. What are the slang words? Well, and that also goes to— That are relevant to? The specific words, they're very limited. So you have the first July 12th call. There was the line about going in because it's my lineup. You have the reference to Charles Xavier, which I don't think is slang, and he's basically identifying that as the leader of the X-Men. And then you have the reference to tools. So that's the first call. The second— Wait, the Charles Xavier point. I mean, that's sort of the interesting idea, right? Because, like, I don't know who Charles Xavier is, right? I mean, maybe other people do. I mean, I do now based on this case. But when I read it, I had no idea who Charles Xavier was. I actually sort of assumed he was a basketball player or something. So how does that information get across, right? So, I mean, how should the government— Take this case off, but how should the government introduce that information, right? So they've got Charles Xavier. They believe that that's a reference to the leader of the X-Men, and that therefore means that he's indicating that he is the leader. What is the best way for the government to get that in? Because on the one hand, the fact that Charles Xavier is the leader of the X-Men requires, like, a movie background maybe. I mean, my clerk could tell you, I'm sure, but, like, I don't know that. But then also you've got to then translate, you know, Charles Xavier is the leader of the X-Men means that he's representing that he's a leader, right? I mean, on the one hand, that's expert testimony, but it's not really an agent expert. It's, like, pop culture expert. I don't think that that is—I would not consider that expert testimony. I don't think—I think that was just his general knowledge and awareness. But is it something within the, like, knowledge of the ordinary, you know, person? And, I don't know, Charles Xavier, it strikes me, in a certain demographic that might be well within their knowledge, right? I mean, we talked to John back there. John probably knows exactly what that is. But the rest of the demographic has no idea who Charles Xavier is. I think that I would draw from this court's case language, and it's—the question is, is it the sort of expert testimony resulting from a process of reasoning which can only be—that can be mastered only by specialists in the field? I think somebody who watches that movie can figure out who Charles Xavier is. I do think it's helpful. I know that in my office, when I was preparing for this moot, some people did not know who Charles Xavier was. In terms of the meaning of this, I mean, the defendant even talks about, yeah, I referred to myself as Charles Xavier. It's a figure of speech. I think also when you listen to the conversation in context, I don't believe it was necessary— I think knowing that Charles Xavier was the leader of the X-Men is useful information. But if you continue to look at his words, he says, you know what I'm saying, and I orchestrate. I'm the mastermind of all the doors. So I think that he's also—in context, he's— Right, but in order to explain that to a jury, you've got to bring in outside information. And that's what we think of as being an expert, right, is that, like, you're bringing in some outside information, and a pop culture reference, you know, strikes me as, like, an issue of expertise. And you need to bring in, like, the 19-year-old intern and get them to testify. Yes, everybody in my generation would know that Charles Xavier is an X-Man or whatever he is. Lay opinion—witnesses offer, though, lay opinion, drawing from their life experiences all the time. So, again, I don't think that this is—you need a film expert to be able to speak to this. So I think that anybody who had watched this movie or was familiar with the X-Men could say, oh, Charles Xavier, he's the leader of the X-Men. I don't think that is the type of specialized knowledge that Rule 702 is getting at. And if I can, to look at the other calls, the second call from July 12th, there was simply the reference to straight to the back room. The defendant's mind and focus was on the mission and the use of the word orchestrating, which, again, I don't think it was really necessary to define orchestrating. It was used in its conventional term. Yeah, none of that strikes me as something I need help understanding. Yes. And, I mean, if you listen to the telephone calls, I mean, in both the July calls, the defendant talks about orchestrating. So that's sort of a word that he liked to use. And then for the October 12th phone call, you have the basketball game. And the testimony was that that was oddly cryptic, even for a jail call, to be speaking about such an innocuous subject in that kind of way. And then also when you looked at the timing and then how certain things were described and how they correlated with, now the agent didn't talk about that, but we know from the other evidence how it correlated with what unfolded that day, how there was a different team from New York who was going to come down and rob the Garner K-Jewelers that they were spooked. That then Maynard and Brown said, we'll do it, put us in the game. There's the reference. And a lot of the phone calls, a lot of the testimony about the phone call, I'd say probably about half, it was connecting street names and references to people that are mentioned in the phone call to the defendant and explaining who that was. That Malik was referring to Malik Maynard. That Bless was the street name for Christopher Brown. That Adele was the individual who was known to be the fence at the Four Seasons Mall. He had a jewelry store. So Haas was the individual who was identified as coming down from New York City. So I think that when you— So talk about the Four Seasons fence guy. So an expert could rely on that, right? Because an expert can rely on hearsay. But was there admissible evidence that he was the fence? Yes. The Maynard and Brown both— Had both testified. Had both testified. So he's—in that context, he's relying on other individuals' witness testimony, which we think about like an expert doing. But do we really think about like a lay witness sort of saying, oh, let me pull all these pieces together for you? I mean, I think he is testifying about what his investigation revealed to him as to who these individuals were. He does talk about the connections between the people separately. Like in his testimony, he talks about who Tamika Lloyd was, who Ms. Baldwin was. And that's all information that he gained throughout the course of his investigation. And I'd like the court also to look at—to consider the smaller portion of the testimony that Robertson—that these calls were. I mean, he talked about his background. He linked the vehicles and the license plates to the different locations. He helped to corroborate the trip to New York with the license plate readers and everything. Talked about the relationship between the defendant and Lloyd. He discussed the evidence that came in through the pawn shops linking the slips and the jewelry. He spoke at length about the mail intercept. And then there was this part about the phone calls. And there were—so we have the lineup, tools, back room, mission, basketball game. I think that when you look at—in the context of his testimony, I don't think it's necessarily like a clear error that immediately upon segueing into these phone calls that it should have been obvious that this was not lay testimony, that it was expert testimony. Even as we're discussing it here, I think we're struggling. So I think that goes to show that you can't—that the defendant can't meet the plain error test. And at least with respect to the 2nd July call and the October basketball call, there were no objections. And if I can back up a little bit again to the overwhelming evidence. In addition to what we've talked about, we have the surveillance footage. There's the Verizon employee that puts him scoping out the garner. We have the pawn shop jewelry that was collected from the Greensboro pawn shops. And those were pawned by people who were linked to the defendant. We have the recorded calls. And then we also have very egregious post-arrest conduct. All of this demonstrates that this was a compelling and overwhelming case against the defendant. So even if you were to assume that the victim impact testimony was error or that this agent testimony was error, it was not prejudicial to the defendant. And that is why we ask you to affirm the judgment of the district court. All right. Thank you. Mr. Mahan? Yes. And let me address a few of these issues. This case, the agent's testimony about the calls, I think, aligns with what happened in Johnson. He reviewed calls he had no role in. As an investigator, apparently he got copies of the recordings. It is very different, for example, from a DE agent who's involved in an ongoing investigation of an ongoing drug operation who's listening through a wiretap or whatever to calls and interpreting drug code. I will say on the X-Men, if the government believed that jurors didn't know who Charles Xavier was, they could call somebody with knowledge of the X-Men. There's probably a lot of people. Interestingly, the agent himself said, I'm not an expert on the X-Men. I understand that he's a leader. Apparently he himself didn't have much knowledge of that. So the calls crossed the line that this court has set forth in Johnson. I will also say in considering the impact of this, I do believe that the introduction of the agent's testimony is the strongest issue, but it's not the only issue. So if there was error in allowing the victims to testify not just about how they reacted at the time, but the long-term impacts, and if there was error in allowing them to identify Mr. Walker as the decoy or give an opinion that he was just acting afraid, all of that contributes. And then you've got Mr. Walker basically being unfairly balanced against in his testimony by these opinions and this very emotional testimony. And I will say, for example, that with the first victim, when she described what happened first, the government then said, can you tell us what that means? And invited her to go further and to give this testimony that went way beyond what happened in the robbery and had the long-term impacts. And, of course, as the court has noted, this is a case not only where the co-defendants had guns. It was on video. Everybody could watch what happened. They could see the guns. There really was no question that this was a robbery. The only question was whether Mr. Walker played a role. And so for those reasons, we believe that this does rise to the level of plain error and that Mr. Walker is entitled to a new trial. And I'm happy to answer any further questions. All right. Thank you. And thank you to both counsel for your arguments today. We hope someday soon to resume our normal practice of coming down and greeting you formally after argument. But until then, safe travels back to North Carolina. Thank you. Thank you.
judges: Stephanie D. Thacker, Julius N. Richardson, Allison J. Rushing